UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| STEPHEN AQUINO, <br> TDCJ–CID No. 1495015, § § § | | |
| *Petitioner*, § | | |
| § | Civil Action No. SA-15-CV-00323-XR | |
| v. § § | | |
| WILLIAM STEPHENS, Director, Texas Department of Criminal Justice - Institutional Division, § § § § | | |
| *Respondent*. § | | |

### ORDER

On this day, the Court considered Petitioner Stephen Aquino's amended petition for issuance of a writ of habeas corpus (Docket no. 2), Magistrate Judge Pamela A. Mathy's Report and Recommendation (Docket no. 37), and Petitioner's objections thereto (Docket no. 41). After careful consideration, the Court will ACCEPT Judge Mathy's recommendations, DENY Petitioner's requests, and DISMISS this case.

### BACKGROUND

**I.   Factual Background**

The Magistrate Judge's Report and Recommendation sets forth the background by quoting the Texas Fourth Circuit Court of Appeals' factual summary of Petitioner's direct appeal. Docket no. 37 at 4–7 (quoting *Aquino v. State*, No. 04-08-00445-CR, 2009 WL 3030749, at *2 (Tex. App. Sept. 23, 2009)). Because the Texas appellate court's statement of the case is clear and complete, and Petitioner did not object to the Magistrate Judge's use of these facts for background, the Court sets forth the same background here:

The following facts are undisputed by the eyewitnesses, including [Petitioner]. In January 2007, [Petitioner] and four others—Joel Perez, Ricardo Barbosa, Kevin Bartlett, and Rosendo Dimas [Rosendo Dimas III]—spent the evening drinking at a "strip club." After the men left the club, [Petitioner] became angry over some missing money that he intended to use to purchase a Beretta handgun. All five men left the club and went to Barbosa's house, but soon left in [Petitioner]'s truck; [Petitioner] was driving. [Petitioner] drove to a deserted area, and after the murder the truck became stuck, the wheels spinning until the truck was placed into fourwheel drive. Beyond this testimony, [Petitioner]'s version of events differs dramatically from that given by the other witnesses who testified at trial.

Barbosa testified that after the five men left his house they drove south on Highway 16, ending up in an open field. Barbosa got out of the truck to urinate and left his Glock handgun in the vehicle. Barbosa testified he heard "[a] gun go off." When he looked toward the back of the truck, he was surprised to see [Petitioner] shooting at Dimas. Barbosa stated [Petitioner] fired several shots at Dimas, including shots fired after Dimas was lying on the ground. Barbosa testified that at the time of the shooting he was able to see all of the men clearly and [Petitioner] was the one who shot Dimas. Barbosa stated he got back into the truck. The group, less Dimas, left and [Petitioner] dropped Barbosa at his house. Barbosa testified [Petitioner] picked him up the next day "to go sell the gun." Barbosa stated [Petitioner] sold a gun, which Barbosa believed was a "SKS," and Barbosa sold his Glock because he thought it was used to kill Dimas. Eventually, Barbosa was contacted by police. When he first met with police, he denied witnessing the murder, telling police that although he had been with the other men earlier in the day, he stayed home when everyone else went out. However, during a second visit with police, and after being confronted with information in their possession, Barbosa admitted witnessing the murder and gave police a statement.

Perez, [Petitioner]'s cousin, offered testimony similar to Barbosa's. He agreed the men left Barbosa's together, and drove to an open field in south Bexar County. According to Perez, [Petitioner] said they were going to test fire the Beretta [Petitioner] purchased. Perez testified everyone got out of the car, and as he was getting out he heard gunshots. He saw [Petitioner] shoot at Dimas multiple times, and heard Dimas "yelling or whatever in pain." Perez testified [Petitioner] shot Dimas with the Glock. Perez said [Petitioner] claimed he shot Dimas because he stole the $100. Perez stated [Petitioner] told him to check Dimas's pockets, but he refused. [Petitioner] then told Bartlett to do it, and he complied. When they got back into the truck, [Petitioner] threatened them, stating that if anyone talked about what they saw they would "end up in the ditch too." [Petitioner] also told them that if they were questioned by police they should say Dimas "left walking from Rick's house." When [Petitioner] dropped off Barbosa, he handed the Glock to Perez and told him to "[g]ive this to Rick." Perez gave the gun to Barbosa as instructed. Later, when they were at Perez's house, [Petitioner] told Perez not to say anything about the murder because they were family. [Petitioner] also said

2

that if Barbosa or Bartlett talked, he would shoot them. The next day, [Petitioner] called to see if Perez wanted to go to the gun show with him to sell the Glock and the Beretta; Perez declined. Perez eventually contacted police because he was receiving threatening phone calls. As Barbosa, Perez lied to police when they first questioned him. Perez told police, as instructed by [Petitioner], that Dimas just walked away from Barbosa's house. However, he also eventually told police [Petitioner] murdered Dimas.

Bartlett, who was friends with Dimas, admitted Dimas took the missing $100 off the truck console. Bartlett said he believed Dimas "was too intoxicated to realize what he was doing." According to Bartlett, once the money went missing [Petitioner] began threatening them, took the Beretta, and refused to return it. Bartlett, the owner of the Beretta, did not attempt to get the gun from [Petitioner]. Bartlett said he was afraid for himself and Dimas. After leaving Barbosa's, the men "headed out into the county" in [Petitioner]'s truck. Bartlett claimed he was told they were going to a party. When they pulled over, Bartlett was told they were going to stop and shoot the Beretta. Everyone got out of the truck. Bartlett was the last man out, and as he was exiting he "started hearing gunshots." At first, he thought it was the gun being test fired, but as he got out he saw Dimas fall and heard him say, "You shot me." He testified he saw Dimas fall, and saw [Petitioner] with a gun in his hand. After Dimas fell, Bartlett saw [Petitioner] empty the clip into Dimas, saying "It's all about respect. This would have never happened if you hadn't stole my $100." Bartlett testified he was stunned and backed up between the truck's door and frame because he thought he was about to die. Bartlett said [Petitioner] then approached him and told him to follow directions or he would "get one in the head." [Petitioner] then instructed Bartlett to check Dimas's pulse and get "his money" out of Dimas's pocket. When [Petitioner] was talking to Bartlett he still had the gun in his hand. Bartlett did as he was told and found a $100 bill and a $50 bill in Dimas's pockets. He gave the money to [Petitioner]. After the men got back into the truck, [Petitioner] told him not to say anything, which Bartlett perceived as a threat. Bartlett said he tried to remain calm, but was "scared for [his] life." Bartlett testified that when [Petitioner] dropped him off at his house, [Petitioner] took his driver's license. [Petitioner] told Bartlett he took the license so that if Bartlett talked about the murder [Petitioner] could come back to the house and kill Bartlett and his family. Just as with Barbosa and Perez, when police eventually talked to Bartlett, he initially lied, saying he went home when everyone left the club. Bartlett later admitted he lied, but said he did so because he was scared [Petitioner] would kill him. He eventually admitted to seeing [Petitioner] shoot Dimas.

[Petitioner] testified on his own behalf. He stated that when the group left Barbosa's house, Barbosa and Perez gave him directions, allegedly to the home of some women. He claimed to need directions because he was unfamiliar with the south side of San Antonio. Barbosa and Perez told him to drive south on Highway 16, but then told him he missed the turn and needed to turn around. After he made a u-turn, Barbosa and Perez told him to pull over because they needed to urinate.

3

> When he pulled off the road, everyone except Dimas got out of the truck. According to [Petitioner], Dimas did not immediately get out of the truck because he was "passed out." Dimas soon woke up and got out of the truck. [Petitioner] stated that while he was using the bathroom, Bartlett and Dimas were standing together talking on one side of the truck, Barbosa and Perez were standing together and talking on the other side. [Petitioner] testified that when he turned around to tell everyone to get back into the truck so they could leave, he saw Barbosa pull out the Glock, cock it, and hand to it (*sic*) Perez. He then saw Perez turn around and fire two or three rounds in the direction of Dimas and Bartlett. [Petitioner] said Dimas's back was to Perez. After the shots were fired, [Petitioner] saw Dimas's body turn and fall. Perez walked toward him and "fired the rest of the rounds" into Dimas. According to [Petitioner], he heard Barbosa tell Perez, "You know you f— up." [Petitioner] claimed it was Perez who told Bartlett to get the money from Dimas's pockets. Then, everyone got into the truck. [Petitioner] claimed he had the Beretta with him at all times, and refused to give it to Barbosa when he asked for it. [Petitioner] denied threatening anyone on the drive home. He stated Barbosa took the Glock with him when he got out of the truck. [Petitioner] admitted taking Bartlett's driver's license, but claimed it was Perez's idea and he did it only to help Perez. [Petitioner] said Perez instructed him on the story he was to tell about the murder, and then he went home. [Petitioner] admitted he lied when he told police that the last time he saw Dimas was the morning before the murder. [Petitioner] testified Perez instructed him to tell this lie. [Petitioner] testified he did not shoot Dimas, and his only involvement in the entire incident was taking Bartlett's license at Perez's request.

*Aquino v. State*, 2009 WL 3030749, at *1–2.

Not mentioned in the above is the trial court exclusion of certain evidence, which is now relevant to Petitioner's federal habeas application. The trial court did not admit Joel Perez's testimony about a confrontation with Dimas' father and Dimas' fathers' testimony about the same confrontation. Docket no. 19-5 at 147–49. Outside the presence of the jury, Petitioner's trial counsel made an offer of proof of Perez's testimony about Dimas' father confronting him. *Id*. According to Perez, Dimas' father might have told him a month before the shooting that Dimas had "snitched" about Perez's role in several vehicle burglaries by mentioning it to him (Dimas' father). *Id*. Trial counsel's theory was that this testimony would be proof of Perez's motive to kill Dimas, but the trial court excluded this testimony as hearsay while leaving open the possibility of admitting it later through a different legal theory. *Id*. Later, the trial court

4

allowed Dimas' father to testify on direct examination that about two weeks before the shooting, he told Perez that he and Dimas' mother learned of Perez's prior criminal activities. Docket no. 19-8 at 115–17. The trial court admitted this testimony but limited it strictly to what Dimas' father said to Perez, excluding Perez's responses and any basis that Dimas' father may have had for this testimony from previous conversations with his son. *Id*.

## II.     Procedural Background

A jury returned a guilty verdict on Petitioner's murder charge, and sentenced him to 60 years imprisonment. Docket no. 19-13 at 96–97.

Petitioner filed a direct appeal, and the Texas Fourth Court of Appeals affirmed his conviction on September 23, 2009. *Aquino v. State*, 2009 WL 3030749 (Tex. App. Sept. 23, 2009). Petitioner did not file a petition for discretionary review to the Texas Court of Criminal Appeals, Docket no. 1 at 2, but he did file a state application for writ of habeas corpus, which was denied without written order after an April 2015 hearing. Docket no. 19-12 at 1.

On April 22, 2015, Petitioner filed his federal petition for writ of habeas corpus in this Court, followed by his amended petition the next day. Docket nos. 1, 2. Respondent filed the state court records, Docket nos. 18, 19, and Petitioner filed a corrected memorandum in support of his federal habeas application, Docket no. 25. Respondent filed an answer to the petition, Docket no. 33, and Petitioner filed a reply, Docket no. 36.

Petitioner raises two grounds for relief in his habeas application—ineffective assistance of counsel and actual innocence. *See* Docket no. 2. His claims for ineffective assistance of counsel arise from the conduct of both his trial counsel and appellate counsel. *Id*. He claims that his trial counsel was ineffective by failing to object to the exclusion of certain testimony, failing to request that testimony previously deemed inadmissible be admitted in light of the state

5

"opening the door" to this evidence, and failing to present evidence suggesting an alternative perpetrator. Docket no. 25 at 21, 45, 51. He claims that his appellate counsel was ineffective by failing to assert Petitioner's right to present a complete defense and to confront witnesses, failing to challenge the trial court's ruling on the exclusion of certain testimony, and failing to raise a violation of Petitioner's right to a complete defense with regard to a motion for new trial. *Id.* at 76–80. His actual innocence claim is based on three newly-acquired affidavits and the evidence that he claims was wrongfully excluded. *Id.* at 120.

On February 1, 2016, Magistrate Judge Pamela A. Mathy issued a Report and Recommendation. Docket no. 37. She recommended that this Court deny the petition for a writ of habeas corpus and its implicit request for the issuance of a certificate of appealability. *Id.* Now before the Court are Petitioner's objections to these recommendations, which he filed on March 7. Docket no. 41.

## DISCUSSION

### I. Standards of Review

#### a. District Court Review of a Magistrate Judge's Memorandum and Recommendation

Where no party has objected to the Magistrate Judge's Memorandum and Recommendation, the Court need not conduct a *de novo* review of it. *See* 28 U.S.C. § 636(b)(1) ("A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings and recommendations to which objection is made."). In such cases, the Court need only review the Memorandum and Recommendation and determine whether it is either clearly erroneous or contrary to law. *United States v. Wilson*, 864 F.2d 1219, 1221 (5th Cir. 1989).

On the other hand, any Memorandum and Recommendation that is objected to requires *de novo* review. Such a review means that the Court will examine the entire record and will make an independent assessment of the law. The Court need not, however, conduct a *de novo* review when the objections are frivolous, conclusive, or general in nature. *Battle v. United States Parole Commission*, 834 F.2d 419, 421 (5th Cir. 1987). In this case, Jackson objected to the Magistrate Judge's recommendation, so the Court will conduct a *de novo* review. Docket no. 39.

### b. Federal Habeas Corpus Relief

To conduct a *de novo* review of the objected-to portions of the Report and Recommendation, the Court looks to the applicable standards governing federal habeas corpus relief. Because Petitioner filed his federal habeas corpus action after the effective date of the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), this Court's review of his claims for federal habeas corpus relief is governed by the AEDPA. *Penry v. Johnson*, 532 U.S. 782, 792 (2001). Under this standard, Petitioner is not entitled to federal habeas corpus relief in this cause in connection with any claim that was adjudicated on the merits in state court proceedings, unless the adjudication of that claim either: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d); *Brown v. Payton*, 544 U.S. 133, 141 (2005).

Under the "contrary to" clause, a federal habeas court may grant relief if (1) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law; or (2) the state court decides a case differently than the Supreme Court on a set of materially indistinguishable facts. *Payton*, 544 U.S. at 141; *Mitchell v. Esparza*, 540 U.S. 12, 15–16 (2003).

Under the "unreasonable application" clause, a federal habeas court may grant relief if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the petitioner's case. *Payton*, 544 U.S. at 141; *Wiggins v. Smith*, 539 U.S. 510, 520 (2003). A federal court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *McDaniel v. Brown*, 558 U.S. 120, 132–33 (2010).

Federal habeas review of a state court's factual findings is also significantly restricted. Federal habeas relief may not be granted on any claim that was adjudicated on the merits in state courts unless the state court's adjudication of the claim resulted in a decision based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d)(2); *Wood v. Allen*, 558 U.S. 290, 301 (2010) ("[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance."). A petitioner challenging a state court's factual findings must establish by clear and convincing evidence that the state court findings were erroneous. 28 U.S.C. § 2254(e)(1).

## II.   Analysis of Petitioner's Objections

Petitioner designated five separate objections to the Magistrate Judge's Report and Recommendation, though in many places, these objections collapse into the same general argument. The Court will now address each of these arguments as they relate to each of Petitioner's separate grounds for relief.

### a.   Ineffective Assistance of Counsel

For an ineffective assistance of counsel claim to succeed, a habeas petitioner must show (1) that counsel's performance was deficient, and (2) that the deficient performance prejudiced

the defense.[1] *Strickland v. Washington*, 466 U.S. 668, 697 (1984). To show that counsel's performance was deficient, a criminal defendant must show that counsel's representation fell below an objective standard of reasonableness. *Id*. at 708; *Williams v. Taylor*, 529 U.S. 362, 390–91 (2000). Courts try to eliminate the distorting effects of hindsight and are deferential when reviewing the performance of counsel, who enjoys a strong presumption that his or her conduct was reasonable. *Strickland*, 466 U.S. at 689; *see Wiggins v. Smith*, 539 U.S. 510, 523 (2003). Counsel is not required to make every plausible argument on behalf of his client; counsel is only required by the Constitution to provide "reasonably effective assistance." *Strickland*, 466 U.S. at 687.

In addition, under *Strickland*, a petitioner must establish that he was prejudiced by counsel's mistake. This requires a showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694.

Petitioner argues that trial counsel was ineffective in failing to admit or exhaustively attempt to admit testimony from Dimas' father and Joel Perez regarding conversations between the two in which Dimas' father indicated to Perez that Dimas had "snitched" to him (Dimas' father) about Perez' criminal activity. Such evidence, Petitioner argues, shows Perez's motive for killing Dimas. Petitioner argues that trial counsel was ineffective in failing to assert the Confrontation Clause as an admissible basis for this evidence and failing to re-assert this

---

[1] This two-step framework applies to claims of ineffective assistance of both trial and appellate counsel. *Goodwin v. Johnson*, 132 F.3d 162, 170 (5th Cir. 1997). Petitioner, however, does not object to the Magistrate Judge's Report and Recommendation with regard to his claim that he received ineffective assistance from his appellate counsel. *See* Docket no. 37 at 22–24; Docket no. 41. Finding the Magistrate Judge's analysis not to be clearly erroneous on this point, the Court accepts it in full.

evidence under the Texas Rule of Optional Completeness after the prosecution allegedly opened the door to it. Docket no. 45 at 46–48.

Trial counsel testified in an affidavit in Petitioner's state habeas proceeding that he strategically made the choice not to pursue these lines of questioning. Docket no. 19-13 at 135–40. As he points out, the offer of proof of Joel Perez's testimony elicited vague and sometimes unhelpful responses. *Id.* at 137–38. In particular, trial counsel notes that while making his offer of proof and cross-examining Perez outside the presence of the jury, Perez testified "I don't remember if [Dimas' father] said that he did snitch on me or he thought he did. I don't know." Docket no. 19-5 at 147. As to the direct examination testimony of Dimas' father, trial counsel thought that the theory of Perez being the murderer depended on Perez being angry at Dimas, a fact not supported by any evidence. Docket no. 19-13 at 136–37. Given the full context of the offer of proof of Perez's testimony and the lack of other evidence suggesting that Perez might be angry with Dimas, trial counsel found this alternative perpetrator theory to be "weak at best." Docket no. 137.

The Magistrate Judge properly rejected Petitioner's arguments. First, Petitioner has not shown that the state habeas court's view of trial counsel's performance was contrary to clearly established United States Supreme Court law, an unreasonable application of Supreme Court precedent, or based on an unreasonable determination of the facts in light of the record before the state court. The record indicates that trial counsel believed this evidence to be weak, and seems justified in his belief, as discussed in more detail below. More importantly, Petitioner has failed to overcome the high presumption that trial counsel's challenged action of not seeking to admit evidence that he viewed as weak "might be considered a sound trial strategy."

Furthermore, regardless of whether trial counsel's view of this evidence as "weak" justifies his strategic choice to not assert it further than he did, Petitioner shown not that he was prejudiced so badly that, "but for counsel's unprofessional errors, the result of the proceeding would have been different." Giving full credibility to the assertion that trial counsel's decision to not pursue the motive theory was unreasonable, the evidence of motive from an alternative murderer (namely, Joel Perez) is quite attenuated. As the state habeas court pointed out, this evidence was not particularly reliable even if it had been admitted—Dimas' father's timeline of his confrontation with Perez differed from Perez's timeline of that same conversation. Docket no. 19-20 at 50. Further, regardless of the timeline, Dimas and Perez lived together, giving Perez many opportunities to kill Dimas without any witnesses instead of doing so, according to Petitioner's theory, in front of two eyewitnesses. *Id*. Moreover, the evidence, at best, indicates that Dimas "snitched" to his father about Perez's criminal activity, rather than to the police or authorities, dulling the impact of what Petitioner alleges gave Perez such a strong motive to kill Dimas. Last, this evidence, even giving it full weight and credibility, is slight compared to the two eyewitness accounts that Petitioner, and not Perez, pulled the trigger. Accordingly, Petitioner has not shown the state court's resolution of the prejudice question was contrary to clearly established United States Supreme Court law, an unreasonable application of Supreme Court precedent, or was based on an unreasonable determination of the facts in light of the record before the state court.[2]

---

[2] Much of Petitioner's argument focuses on the assertion that it is for the jury, not the courts, to assess whether this evidence is credible. *See, e.g.,* Docket no. 41 at 3; Docket no. 25 at 39–45. This argument overlooks the applicable standard. At this stage of federal habeas corpus review, it is for this Court to determine whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *See Strickland*, 466 U.S. at 694. This inquiry necessarily involves an analysis of the evidence's strength, and whether it would have been likely to sway a jury.

Defendant also makes conclusory objections to the Magistrate Judge's recommendations regarding trial counsel's failure to call witnesses who would testify about Joel Perez's propensity for violence and familiarity with firearms.[3] As an initial matter, Petitioner has offered no response to the Magistrate Judge on how this evidence would be admissible despite rules against hearsay and character evidence. *See* TEX. R. EVID. 404(a)(1). Furthermore, his objections are a mere restatement of his initial argument that his claim is not procedurally defaulted, despite having raised the issue on direct appeal,[4] in light of *Ex parte Bryant*, 448 S.W.3d 29, 27 (Tex. Crim. App. 2014), and *Ex parte Torres*, 943 S.W.2d 469 (Tex. Crim. App. 1997). The Magistrate Judge's recommendation adequately addressed this argument, pointing out the factual differences between this case and the cases on which Petitioner relies, and Petitioner raised no specific objections to these distinctions. Docket no. 37 at 20–21. Finally, even if the claim is not procedurally defaulted, Petitioner does not address the Magistrate Judge's finding that trial counsel likely made a wise strategic decision in not seeking to admit such evidence.[5]

In sum, Petitioner has not shown that trial counsel's failure to admit or seek to admit

---

[3] The Magistrate Judge summed up these witnesses as follows:

> In his motion for new trial, defendant called five witnesses who he argues should have been called by [Petitioner's] trial counsel to testify at trial: (1) [Petitioner's]—and Perez's—grandmother who testified that Perez's father told her that Perez killed his best friend and later told her Perez did not commit the murder; (2) [Petitioner's] brother who testified Perez always carried weapons, shot at buildings while driving down the freeway, and once retrieved some stolen property at gunpoint; (3) [Petitioner's] father who saw a handgun and a shotgun in a car in Perez's garage and, later that same day, Perez showed him an assault rifle; (4) [Petitioner's] mother who testified Perez threatened a girlfriend and people were afraid to testify against him; and (5) [Petitioner's] uncle who testified Perez had a violent reputation.

Docket no. 37 at 20 n.70. (citing Docket no. 19-2 at 6–9, 15–17, 18–20, 25, 28–31, 36–37).
[4] *See Ex parte Acosta*, 672 S.W.2d 470,472 (Tex. Crim. App. 1984) ("We need not address applicant's second contention inasmuch as the same issue was raised and addressed by the Fourth Court of Appeals on applicant's direct appeal.").
[5] The Magistrate Judge pointed out that this evidence, even if admissible, "would have opened the door for the prosecution to prove [Petitioner's] character for violence. The prosecution indicated that it had evidence to show [Petitioner's] negligent discharge of a firearm, multiple incidents of assault, attempted murder, infliction of bodily injury, street terrorism, murder, and a threat to shoot a specific person." Docket no. 19 at 22 n.78 (citing Docket no. 18-19 at 52–54, 69–70).

certain evidence of conversations between Joel Perez and Dimas' father, along with evidence of Perez's violent character, constitutes ineffective assistance of counsel. The Court ACCEPTS the Magistrate Judge's Report and Recommendation and DENIES relief on Petitioner's ineffective assistance of counsel claims.

### b. Actual Innocence

In *Schlup v. Delo*, 513 U.S. 298, 323, 327 (1995), the Supreme Court explained that a petitioner seeking to surmount a procedural default through a showing of "actual innocence" must establish that it is more likely than not that, in light of the new evidence, no juror, acting reasonably, would have voted to find the petitioner guilty beyond a reasonable doubt. Claims of actual innocence under *Schlup* permit "a convincing showing of actual innocence [to enable] habeas petitioners to overcome a procedural bar to consideration of the merits of their constitutional claims." *McQuiggin v. Perkins*, 133 S. Ct. 1924, 1928, (2013).

Petitioner argues that *Schlup* provides an independent basis for relief, such that its lower standard for actual innocence applies to all of his actual innocence-based grounds for relief—even those that are not procedurally defaulted. Docket no. 41 at 10–11. He bases this argument in large part on the claim that Texas state law is unsettled on whether *Schlup* claims can be asserted as an independent basis for relief. Docket no. 25 at 82–89. The Court agrees with the Magistrate Judge's findings with respect to the status of *Schlup* claims. A petitioner may assert a *Schlup*-type claim to make a showing of actual innocence on claims that are in some way procedurally barred, but may not invoke *Schlup* as a stand-alone actual innocence claim. *Foster v. Quarterman*, 466 F.3d 359, 367 (5th Cir. 2006). Because this is a federal habeas corpus petition governed by the federal law of this Circuit, Petitioner's reliance on the allegedly unsettled state-law status of *Schlup* claims is inapposite and does not entitle him to relief on any claims that are

not procedurally default.

Because Petitioner asserts at least one claim that is procedurally defaulted, he is entitled to assert a *Schlup* claim on that basis. Like the Magistrate Judge did, the Court will assume for the sake of argument that the relaxed *Schlup* standard applies to *all* of Petitioners claims. The Court agrees with the Magistrate Judge that Petitioner has still failed to carry his burden to show "new" evidence making it more likely than not that no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.

Petitioner first supports his *Schlup* claim by pointing to affidavits from three witnesses.[6] These witnesses all state that they were part of conversations or overhead conversations that allegedly occurred months after Petitioner's trial in which Joel Perez admitted to being the murderer. Docket no. 25 at 97–101. In addition, one of these witnesses, David Perez, Jr., testified that he was the victim of a kidnapping orchestrated by Xavier Perez, the uncle of Joel Perez. Docket no. 25 at 101. As Respondent and the Magistrate Judge both point out, however, this evidence is hardly new—two of these three witnesses testified at a series of state court habeas writ hearings in late 2011 and early 2012, and the third invoked his Fifth Amendment right not to testify at these same hearings. Docket no. 19-20 at 37–39. Furthermore, even if this evidence is new, the state habeas court did not find these witnesses to be credible. *Id*. at 38. This Court is required to give deference to this factual finding of the state court. *See* 28 U.S.C. § 2254(e)(1). Despite Petitioner's objection to this deference, he argues only that "the Court would be required to consider . . . all of the evidence submitted by the Petitioner, and excluded by the trial court, in determining whether it is more likely than not that no reasonable juror would have convicted him." Docket no. 41 at 13. This argument is does not justify the Court substituting its own

---

[6] These witnesses are (1) Rose Cisneros, the ex-wife of both Perez and Petitioner's uncle; (2) Claudia Rodriguez, a friend of Cisneros; and (3) David Perez, Jr., the son of Cisneros and cousin of both Joel Perez and Petitioner.

assessment of the witnesses' credibility in place of the state court's assessment, which was based on the live testimony of the witnesses themselves.

Beyond these three affidavits, Petitioner presents the affidavit of Officer Paul Sanchez. Docket no. 25 at 101–03. This affidavit relays Officer Sanchez's physical description of a beaten David Perez, Jr. to corroborate the kidnapping story. *Id*. Petitioner's apparent theory is that this evidence supports an inference that Joel Perez, by virtue of his relationship to a kidnapper, is violent. *Id*. Petitioner also points to an affidavit from Victoria Aquino, Petitioner's mother, which recites a letter that she received from an incarcerated David Perez, Jr. *Id*. at 103–04. The letter reads: "I tried calling [Petitioner's counsel] but for some reason he doesn't accept collect calls . . . But I am willing to talk to him . . . *I Know the Truth* . . . tell [Petitioner] to hold on I'm almost out hopefully by Thanksgiving and I'll be able to testify on my behalf on what I know." *Id*. at 104 (emphasis original).

Assuming, as the Magistrate Judge did, that it is proper to evaluate the entirety of this evidence under the *Schlup* standard, Petitioner's argument fails. Two eyewitnesses testified at trial that Petitioner was the shooter. Petitioner does not explain why these two eyewitnesses would have conspired together to falsely identify him as the shooter, or how they might have misidentified him as such. When viewed next to these two eyewitness accounts, Petitioner's circumstantial, tangential, and non-credible evidence does not establish that it is more likely than not that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.

With respect to a similar analysis of the evidence done by the Magistrate Judge, Petitioner objects that "Petitioner had no burden in his trial . . . The standard imposed by the Magistrate Judge in weighing Petitioner's motive defense goes beyond that required by the

15

constitution, specifically, that the state prove his guilt beyond a reasonable doubt." Docket no. 41 at 14. Petitioner conflates the burden that the state had to carry at trial with the burden he must carry in his *Schlup* claim. *Schlup* places the burden on Petitioner to prove that it is more likely than not that, in light of new evidence, no juror, acting reasonably, would have voted to find the petitioner guilty beyond a reasonable doubt. *Schlup v. Delo*, 513 U.S. 298, 327 (1995). Petitioner has not carried this burden.

For these reasons, the Court ACCEPTS the Magistrate Judge's Report and Recommendations and DENIES relief on Petitioner's actual innocence claim.

### III.   Petitioner's Implicit Request for a Certificate of Appealability

Petitioner's only objection to the Magistrate Judge's recommendation to deny the implicit request for a certificate of appealability is conclusory and generalized. He lists the Magistrate Judge's recommendation to deny the certificate and states that he objects without analyzing the issue further. Docket no. 25 at 1–2. Because this objection is conclusive and general in nature, the Court need not conduct a *de novo* review. *Battle v. United States Parole Commission*, 834 F.2d 419, 421 (5th Cir. 1987). Finding no clear error with this aspect of the Magistrate Judge's Report and Recommendation, the Court ACCEPTS this recommendation and DENIES any implicit request by Petitioner for a certificate of appealability.

### CONCLUSION

The Court ACCEPTS Magistrate Judge Pamela A. Mathy's Memorandum and Recommendation (Docket no. 37) after conducting a *de novo* review of the objected-to portions and finding that the remainder is not clearly erroneous. Petitioner Stephen Aquino's amended petition for issuance of a writ of habeas corpus (Docket no. 2) is DENIED. Petitioner's request for the issuance of a certificate of appealability is DENIED. This case is hereby DISMISSED.

It is so ORDERED.

SIGNED this 31st day of October, 2016.

_____

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE